UNITED STATES OF AMERICA
UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

_____

| | | |
|---|---|---|
| LAMESHA S. A. MILLER, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 1:14-cv-1083 |
| | ) | |
| v. | ) | Honorable Janet T. Neff |
| | ) | |
| COMMISSIONER OF | ) | |
| SOCIAL SECURITY, | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

## OPINION

This is a social security action brought under 42 U.S.C. §§ 405(g) and 1383(c)(3), seeking review of a final decision of the Commissioner of Social Security denying plaintiff's claims for disability insurance benefits (DIB) and supplemental security income (SSI) benefits. On July 2, 2011, plaintiff filed her applications for DIB and SSI benefits.[1]   (PageID.311-17).   She alleged a November 15, 2009, onset of disability.   (PageID.311, 313).   Plaintiff's claims were denied on initial review. (PageID.137-50, 152-65).   On February 26, 2013, she received a hearing before an administrative law judge (ALJ), at which she was represented by counsel. (PageID.76-115).   On April 12, 2013, the ALJ issued his decision finding that

_____

[1] A summary of plaintiff's history of earlier unsuccessful applications for DIB and SSI benefits is found on the first page of the ALJ's opinion.   (Op. at 1, ECF No. 8-2, PageID.53).

plaintiff was not disabled.   (PageID.53-68).   On August 14, 2014, the Appeals Council denied review (PageID.29-31), and the ALJ's decision became the Commissioner's final decision.

Plaintiff filed a complaint seeking judicial review of the Commissioner's decision denying her claims for DIB and SSI benefits.   She asks the court to overturn the Commissioner's decision on the following grounds:

1.   The ALJ failed to give appropriate weight the opinion of Harland Holman, M.D., a treating physician.

2.   The ALJ improperly evaluated the opinions of two consultative examiners:   Psychologist Allison Bush and Ms. Carolyn Boersma, a therapist.

3.   The ALJ's factual finding regarding plaintiff's residual functional capacity (RFC) and credibility are not supported by substantial evidence.

(Statement of Errors, Plf. Brief at 1-2, ECF No. 13, PageID.997-98).[2]

Upon review of the record, and for the reasons stated herein, the Commissioner's decision will be affirmed.

---

[2] Plaintiff did not include any argument in her statement of errors asserting that she met or equaled the requirements of a listed impairment.   Further, no such argument is found in the body of her brief.   Thus, it is unclear why defendant chose to address an issue regarding listing 14.02 that had not been raised and preserved as an appellate issue.   (See Def. Brief at 1, 6-8, ECF No. 14, PageID.1018, 1023-25 ).   Plaintiff made the argument at the administrative level (PageID.79), but abandoned it here.   Plaintiff correctly notes in her reply brief that she "never argued [in her initial brief] that her lupus satisfie[d] Listing 14.02."   (Reply Brief at 1, ECF No. 15, PageID.1038).   There is no issue before the Court regarding listing 14.02.   Section I of defendant's brief (PageID.1023-25) is disregarded.

## Standard of Review

When reviewing the grant or denial of social security benefits, this Court is to determine whether the Commissioner's findings are supported by substantial evidence and whether the Commissioner correctly applied the law.   *See Elam ex rel. Golay v. Commissioner*, 348 F.3d 124, 125 (6th Cir. 2003); *Buxton v. Halter*, 246 F.3d 762, 772 (6th Cir. 2001).   Substantial evidence is defined as "'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'"   *Heston v. Commissioner*, 245 F.3d 528, 534 (6th Cir. 2001) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)); *see Rogers v. Commissioner*, 486 F.3d 234, 241 (6th Cir. 2007). The scope of the Court's review is limited.   *Buxton*, 246 F.3d at 772.   The Court does not review the evidence *de novo*, resolve conflicts in evidence, or make credibility determinations.   *See Ulman v. Commissioner*, 693 F.3d 709, 713 (6th Cir. 2012); *Walters v. Commissioner*, 127 F.3d 525, 528 (6th Cir. 1997).   "The findings of the [Commissioner] as to any fact if supported by substantial evidence shall be conclusive . . . ."   42 U.S.C. § 405(g); *see McClanahan v. Commissioner*, 474 F.3d 830, 833 (6th Cir. 2006).   "The findings of the Commissioner are not subject to reversal merely because there exists in the record substantial evidence to support a different conclusion.  . . .  This is so because there is a 'zone of choice' within which the Commissioner can act without fear of court interference."   *Buxton*, 246 F.3d at 772-

73.   "If supported by substantial evidence, the [Commissioner's] determination must stand regardless of whether the reviewing court would resolve the issues of fact in dispute differently."   *Bogle v. Sullivan*, 998 F.2d 342, 347 (6th Cir. 1993); *see Gayheart v. Commissioner*, 710 F.3d 365, 374 (6th Cir. 2013) ("A reviewing court will affirm the Commissioner's decision if it is based on substantial evidence, even if substantial evidence would have supported the opposite conclusion.").   "[T]he Commissioner's decision cannot be overturned if substantial evidence, or even a preponderance of the evidence supports the claimant's position, so long as substantial evidence also supports the conclusion reached by the ALJ."   *Jones v. Commissioner*, 336 F.3d 469, 477 (6th Cir. 2003); *see Kyle v. Commissioner*, 609 F.3d 847, 854 (6th Cir. 2010).

## Discussion

The ALJ found that plaintiff met the disability insured requirement of the Social Security Act from November 9, 2009, through the date of the ALJ's decision. (Op. at 4, PageID.56).   Plaintiff had not engaged in substantial gainful activity on or after November 9, 2009.   (*Id.*).   Plaintiff had the following severe impairments: "lumbar cervical spine arthralgias; systemic lupus erythematosus (SLE); affective disorder; and opioid abuse."   (*Id.*).   Plaintiff did not have an impairment or combination of impairments which met or equaled the requirements of the listing of impairments.   (*Id.*).   The ALJ found that plaintiff retained the residual functional capacity (RFC) for a limited range of sedentary work:

> After consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform less than a full range of sedentary work as defined in 20 CFR 404.1567(a) and 416.967(a).  She could lift and carry up to 10 pounds; and in an 8-hour workday with normal breaks, she could stand and walk for a total of about 2 hours, could sit for a total of about 6 hours, and would require a sit/stand option every 15 minutes.  She could occasionally climb ramps and stairs, balance and stoop; could do no kneeling, crouching, crawling, or climbing of ladders, ropes or scaffolds; should avoid concentrated exposure to temperature extremes; and should have no exposure to unprotected heights or dangerous moving machinery.  She could remember and carry out simple instructions in jobs; should have no more than occasional interaction with supervisors and coworkers; and should have no interaction with the general public.

(Op. at 7, PageID.59).   The ALJ found that plaintiff's testimony regarding her subjective functional limitations was not fully credible.   (*Id.* at 7-14, PageID.59-66).

Plaintiff was unable to perform any past relevant work.   (*Id.* at 14, PageID.66).   She was 32 years old as of her alleged onset of disability and 35 years old as of the date of the ALJ's decision.   Thus, at all times relevant to her claims for DIB and SSI benefits, plaintiff was classified as a younger individual.   (*Id.* at 15, PageID.67).   Plaintiff has a high school education and is able to communicate in English.   (*Id.*).   The transferability of job skills was not an issue because all plaintiff's past relevant work was unskilled.   (*Id.*).

The ALJ then turned to the testimony of a vocational expert (VE).   In response to a hypothetical question regarding a person of plaintiff's age, and with her RFC, education, and work experience, the VE testified that there were approximately 4,400 jobs in Michigan that the hypothetical person would be capable of performing.   (*Id.*; *see* PageID.110-13).   The ALJ found that this constituted a significant number of

jobs.   Using Rule 201.27 of the Medical-Vocational Guidelines as a framework, the ALJ held that plaintiff was not disabled.   (Op. at 15-16, PageID.67-68).

### 1.

Plaintiff argues that the ALJ violated the treating physician rule in the weight that he gave to a November 2011 letter and February 22, 2012, RFC questionnaire signed by Harland Holman, M.D., one of plaintiff's treating physicians.   (Plf. Brief at 12-14, PageID.1008-10; Reply Brief at 1-3, PageID.1038-40).

The issue of whether the claimant is disabled within the meaning of the Social Security Act is reserved to the Commissioner.   20 C.F.R. §§ 404.1527(d)(1), 416.927(d)(1); *see Warner v. Commissioner*, 375 F.3d 387, 390 (6th Cir. 2004).   A treating physician's opinion that a patient is disabled is not entitled to any special significance.   See 20 C.F.R. §§ 404.1527(d)(1), (3), 416.927(d)(1), (3); *Bass v. McMahon*, 499 F.3d 506, 511 (6th Cir. 2007); *Sims v. Commissioner*, 406 F. App'x 977, 980 n.1 (6th Cir. 2011) ("[T]he determination of disability [is] the prerogative of the Commissioner, not the treating physician.").   Likewise, "no special significance"[3] is attached to treating physician opinions regarding the credibility of the plaintiff's subjective complaints, RFC, or whether the plaintiff's impairments meet or equal the

---

[3] "We will not give any special significance to the source of an opinion on issues reserved to the Commissioner described in paragraphs (d)(1) and (d)(2) of this section."   20 C.F.R. §§ 404.1527(d)(3), 416.927(d)(3); *see Blankenship v. Commissioner*, 624 F. App'x 419, 429-30 (6th Cir. 2015).

requirements of a listed impairment because they are administrative issues reserved to the Commissioner.   20 C.F.R. §§ 404.1527(d)(2), (3); 416.927(d)(2), (3); *see Allen v. Commissioner*, 561 F.3d 646, 652 (6th Cir. 2009).

Generally, the medical opinions of treating physicians are given substantial, if not controlling deference.   *See Johnson v. Commissioner*, 652 F.3d 646, 651 (6th Cir. 2011).   "[T]he opinion of a treating physician does not receive controlling weight merely by virtue of the fact that it is from a treating physician.   Rather, it is accorded controlling weight where it is 'well supported by medically acceptable clinical and laboratory diagnostic techniques' and is not 'inconsistent . . . with the other substantial evidence in the case record.'"   *Massey v. Commissioner*, 409 F. App'x 917, 921 (6th Cir.   2011) (quoting *Blakley v. Commissioner*, 581 F.3d 399, 406 (6th Cir. 2009)).   A treating physician's opinion is not entitled to controlling weight where it is not "well-supported by medically acceptable clinical and laboratory diagnostic techniques" and is "inconsistent with the other substantial evidence in [the] case record."   20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2); *see Gayheart v. Commissioner*, 710 F.3d 365, 376 (6th Cir. 2013) (A treating physician's medical opinion is entitled to controlling weight where "two conditions are met:   (1) the opinion 'is well supported by medically acceptable clinical and laboratory diagnostic techniques'; and (2) the opinion 'is not inconsistent with the other substantial evidence in [the] case record.'" (citing 20 C.F.R. § 404.1527(c)(2)).

The ALJ "is not bound by conclusory statements of doctors, particularly where they are unsupported by detailed objective criteria and documentation." *Buxton v. Halter*, 246 F.3d at 773.   An opinion that is based on the claimant's reporting of her symptoms is not entitled to controlling weight.   *See Young v. Secretary of Health & Human Servs.*, 925 F.2d 146, 151 (6th Cir. 1990); *see also Francis v. Commissioner*, 414 F. App'x 802, 804 (6th Cir. 2011) (A physician's statement that merely regurgitates a claimant's self-described symptoms "is not a medical opinion at all.").

Even when a treating source's medical opinion is not given controlling weight, it should not necessarily be completely rejected; the weight to be given to the opinion is determined by a set of factors, including treatment relationship, supportability, consistency, specialization, and other factors.   *See Titles II and XVI: Giving Controlling Weight to Treating Source Medical Opinions*, SSR 96-2p (reprinted at 1996 WL 374188 (SSA July 2, 1996)); 20 C.F.R. §§ 404.1527(c), 416.927(c); *Martin v. Commissioner*, 170 F. App'x 369, 372 (6th Cir. 2006).

The Sixth Circuit has held that claimants are "entitled to receive good reasons for the weight accorded their treating sources independent of their substantive right to receive disability benefits." *Smith v. Commissioner*, 482 F.3d 873, 875-76 (6th Cir. 2007); *see Cole v. Astrue*, 661 F.3d 931, 937-38 (6th Cir. 2011); *Wilson v. Commissioner*, 378 F.3d 541, 544 (6th Cir. 2004).   "[T]he procedural requirement exists, in part, for claimants to understand why the administrative bureaucracy

deems them not disabled when physicians are telling them that they are." *Smith*, 482 F.3d at 876; *see Gayheart v. Commissioner*, 710 F.3d at 376.

Plaintiff alleged a November 15, 2009, onset of disability.[4]  On November 15, 2009, plaintiff appeared at Mercy Health Partners.  She reported that she had been a restrained driver involved in a car accident at 2:30 a.m. that day.  She complained of pain in her legs and lower back.  She was described as a 32 year old woman with no surgical history.  She retained good strength in all extremities.  Her x-rays and MRI scan were negative.  (PageID.529, 566, 587, 619-22, 625, 633-34).  The objective tests failed to reveal any underlying pathology for plaintiff's pain complaints.  (PageID.622, 633, 634).

On January 16, 2010, plaintiff appeared at Mercy Health Partners with complaints of back pain.  She related that she had seen her primary care provider two weeks earlier and he had discontinued her Vicodin and Valium prescriptions because he did not want plaintiff to become addicted to those medications.  Plaintiff was treated and discharged with a limited amount of Vicodin and Valium until her MRI could be performed on January 18, 2010.  (PageID.519-20).  On January 18, 2010, plaintiff's MRI was normal.  (PageID.517-18).

---

[4] Plaintiff presented other evidence dated before the periods at issue on her DIB and SSI claims.  Such evidence is "minimally probative" and is considered only to the extent that it illuminates the plaintiff's condition during the periods at issue.  *See Higgs v. Bowen*, 880 F.2d 860, 863 (6th Cir. 1988).

Plaintiff received treatment by Anthony Wilson, M.D., and Yousif Hamati, M.D., at Orthopaedic Associates of Michigan.   On January 28, 2010, Dr. Hamati found that plaintiff was not in any acute distress.   Her deep tendon reflexes were normal.   Plaintiff reported tenderness in her lower back.   Dr. Hamati noted that the MRI of plaintiff's cervical spine revealed no major findings.   He recommended a MRI of plaintiff's lumbar spine.   (PageID.639-40).

The x-rays taken of plaintiff's lumbar spine on February 6, 2010, were normal. (PageID.516).   The MRI of her lumbar spine on February 6, 2010, returned normal results.   (PageID.517).   On February 18, 2010, Dr. Hamati reviewed the MRI results with plaintiff and noted that they did not indicate any lesion.   He initiated a trial of injections and physical therapy to address plaintiff's pain complaints. (PageID.638).   Dr. Wilson administered injections on February 17, March 22, and April 12, 2012.   Plaintiff did not report any significant pain relief.   (PageID.636-38).

On March 16, 2010, she received a consultative examination by Ms. Carolyn Boersma, an occupational therapist, apparently in relation to other litigation.[5]   Ms. Boersma is not an acceptable medical source.   She had plaintiff fill out a questionnaire (PageID.533-36), recorded her statements, and took Jaymar dynamometer and other measurements.   She made no mention of plaintiff's normal x-ray and MRI results and did not identify the medical basis for imposing any

---

[5] Bates stamp numbers appear across the top of every page of Ms. Boersma's report. (PageID.529-32).

- 10 -

functional restrictions.   Nonetheless, she suggested that plaintiff "would benefit from homemaking assistance in the form of Assist with activities requiring sustained standing >5 minutes, lifting or carrying over 5#, twisting at the waist, or over shoulder height lifting/reaching."   (PageID.529-32).

On March 22, 2010, Dr. Hamati noted that plaintiff's "EMG and nerve conduction studies of both upper extremities and corresponding paraspinal muscles [] revealed no evidence of cervical radiculopathy, brachial plexopathy, carpal tunnel syndrome or ulnar neuropathy across the wrists or elbows (normal study)." (PageID.638; *see* PageID.647-49).

On April 8, 2010, Lynn Nevin, M.D., noted that plaintiff's gait and station were normal.   She had normal muscle strength in her extremities with the exception of a slight reduction in muscle strength in her non-dominant left upper extremity. Plaintiff's mood and affect were stable.   Dr. Nevin initiated a trial of Doxepin for plaintiff's depressive disorder, not otherwise specified.   She referred plaintiff to Dr. Wilson to address her complaints of back pain.   (PageID.574-75).

On April 26, 2010, plaintiff was examined by Tod Wyn, M.D., at the Mercy Health Partners.   He noted that no pathology for the neck and back pain that plaintiff reported had been identified.   Plaintiff's gait was "fine."   Plaintiff was advised to return if her pain increased.   (PageID.622-24).

On May 11, 2010, Dr. Wilson noted that the motor and sensory conduction studies of both plaintiff's lower extremities were normal.   There was "no evidence of lumbosacral radiculopathy, plexopathy or peripheral neuropathy."   (PageID.647).

Plaintiff returned to Dr. Hamati on June 1, 2010.   He noted that plaintiff's MRI had returned normal results.   Plaintiff was not a surgical candidate.   Plaintiff requested and received a referral to a pain clinic.   (PageID.635).

On July 19, 2010, plaintiff saw David Krencik, D.O., at Michigan Pain Consultants, PC, on the referral from Dr. Hamati.   (PageID.651).   Plaintiff reported that she had no history of surgeries.   Her primary complaint was pain in her lumbar spine.   Her straight leg raising tests were negative bilaterally.   Plaintiff was treated with lumbar facet joint injections.   (PageID.651-58).

On August 10, 2010, plaintiff received a consultative examination performed by Psychologist Allison Bush.   (PageID.659-62).   Psychologist Bush was an acceptable medical source.[6]   Plaintiff stated that her medical care was being provided by Muskegon Family Care.   She had three children, ages 4, 8, and 16.   Plaintiff reported that she "last worked in November 2009 before her accident." (PageID.660).   Her overall presentation on arrival for this examination was "of someone who just got out of bed, put on a pair of shoes and came to th[e]

---

[6] Psychologist Bush is a limited license psychologist.   Her credentials qualify her as an acceptable medical source.   *See Molina v. Commissioner*, No. 1:14-cv-648, 2015 WL 5097553, at * 1, 7 (W.D. Mich. Aug. 28, 2015); *Malewitz v. Commissioner*, No. 1:12-cv-1285, 2014 WL 769629, at * 4 (W.D. Mich. Feb. 26, 2014).

appointment."   Psychologist Bush offered a diagnosis of a major depressive disorder, single episode, severe.   She indicated that plaintiff could understand, retain and follow simple instructions.   She expressed some concern that plaintiff might decompensate if she returned to a repetitive concrete work environment. (PageID.662).

September 9, 2010, plaintiff returned to Dr. Nevlin.  (PageID.665-67).   Dr. Nevlin noted that in February Dr. Hamati had advised plaintiff that she was not a surgical candidate.   "She saw Dr. Johnson with the Brain and Spine Center of Shoreline Neurosurcgical Consulting on 4/20/2010.   She is not a surgical candidate." (PageID.665).   Her gait and station were normal.   Plaintiff reported that she was "interested in having a chore worker" and she was advised to contact DHS with regard to that request.   (PageID.667).

On September 23, 2010, plaintiff began seeing Dr. Holman.   He offered a diagnosis of possible fibromyalgia.   (PageID.722-23).   Dr. Holman referred plaintiff to Blake J. Roessler, M.D., a Professor at the at the University of Michigan.   Dr. Roessler was plaintiff's treating rheumatologist.   On March 6, 2011, Dr. Roessler indicated that plaintiff reported an approximately 1-year history of diffuse myalgias, arthralgias, and proximal muscle weakness.   On examination, Dr. Roessler found that plaintiff had normal muscle tone and bulk in her upper and lower extremities. Dr. Roessler's impression based on the examination and the results of laboratory tests was that plaintiff had a mixed connective tissue disease.   He scheduled a muscle

biopsy and started plaintiff on prescriptions for prednisone and methotrexate. (PageID.745-46).   On June 8, 2011, Dr. Roessler gave a diagnosis of lupus erythematosus based on the muscle biopsy and other test results.   He prescribed a course of treatment with prednisone and mycophenolate and scheduled plaintiff for a follow-up examination in two months.   (PageID. 743-44).

In June 2001, plaintiff's transthoracic echocardiography test was normal. (PageID.838-40).

On July 14, 2011, plaintiff reported to Dr. Holman that she had been going to the University of Michigan for treatment.   Fibromyalgia had been ruled out. Plaintiff's primary complaint was sleepiness, but she continued to have back pain and weakness.   She reported that she was starting a new treatment and that she thought that the name was methotrexate.   (PageID 694-95).   On August 17, 2012, plaintiff returned to Dr. Holman.   She indicated that she was seeking pain management and a handicapped parking sticker.   Dr. Holman planned to address plaintiff's complaints of daytime fatigue with a combination of Amitriptyline at night and Adderall in the morning.   (PageID.692-93).

On September 7, 2011, plaintiff returned to Dr. Roessler at the University of Michigan Rheumatology Clinic.   Plaintiff generally reported no side effects from her medications. (PageID.747-48).   When plaintiff returned on February 8, 2012, she reported no improvement.   Dr. Roessler found that plaintiff's musculoskeletal examination was normal.   Plaintiff maintained normal muscle tone, bulk, and

strength in both upper and lower extremities.   Joint examination "revealed no evidence of palpable synovitis, joint effusion or deformity."   Laboratory studies indicated that plaintiff was either noncompliant in taking her mycophenolate or inconsistently compliant in taking it.   (PageID.914-15).

Psychologist Judy Strait reviewed the evidence available as of September 2011, and offered her opinion that plaintiff was not significantly limited in her ability to understand and remember very short and simple instructions.   Plaintiff retained the capacity to perform routine, 2-step tasks on a sustained basis.   (PageID.196-98, 208-10).

On September 20, 2011, plaintiff stated to Dr. Holman that she had some grandchildren that she needed to watch.   Dr. Holman gave her a trigger point injection and a prescription for methadone.   (PageID.806).   On October 28, 2011, plaintiff reported to Dr. Holman that her methadone prescription was helping with her pain.   She stated that she did not experience any side effects from the medication.   (PageID.804).

On November 23, 2011, Dr. Holman signed a two-sentence letter offering an opinion that plaintiff was unable to work:   "Patient is currently not able to work due to medical condition.   For now, this is likely indefinitely, probably more than 1 year, until medication is improved enough to sustain a job."   (PageID.763).   Dr. Holman did not identify what plaintiff's medical condition was, much less identify specific supporting medical evidence.

- 15 -

On December 13, 2011, could not explain to Dr. Holman why medication that had been prescribed for her SLE by Dr. Roessler failed to show up in her tests. (PageID.796-98).

On December 21, 2011, plaintiff underwent a sleep study. Her polysomnogram was normal (PageID.764-65). She had an earlier polysomnogram in August 2011 which was had been normal. (PageID.781-89). Her December 2011 sleep latency study was abnormal. Kevin Kellogg, M.D., noted that for some reason, plaintiff continued to take medications at the time of her study. He noted that plaintiff should decrease her intake of narcotic drugs because they could be the cause of her somnolence. (PageID.774-77).

On January 19, 2012, plaintiff's bone density study was normal. (PageID.831-36).

On February 8, 2012, plaintiff returned to Dr. Roessler at the University of Michigan. Plaintiff retained "normal muscle tone, bulk and strength in both her upper and lower extremities." Her joint examination "revealed no evidence of palpable synovitis, joint effusion, or deformity." Dr. Roessler stated: "My impression is that the patient may either be noncompliant with her mycophenolate or inconsistently compliant with her mycophenolate. I have renewed her prescriptions today and encouraged her to take this medication on a twice daily basis." (PageID.914-15).

On February 22, 2012, Dr. Holman signed an RFC questionnaire. (PageID.879-91).   Dr. Holman indicated that it was "unknown" whether plaintiff was compliant with the course of treatment prescribed.   He indicated that plaintiff had pain and severe fatigue and should avoid prolonged lifting, standing and bending. (*Id.*).

The ALJ noted that plaintiff's May 2012 laboratory reports documented her abuse of opioid medications.   They were "positive for EDDP, Methadone, Oxycodone and Oxymorphone and showing 14 times the normal level of Methadone and 10 times the normal level of Oxycodone (Exhibit B21F p.41) [PageID.922]."   (PageID.64).

On May 25, 2012, Dr. Holman discussed adding a prescription for Neurontin and cutting back on plaintiff's opioid medications which might be the cause of her fatigue.   He also gave plaintiff a prescription for Ritalin.   (PageID.893).   In March 2012, when Dr. Holman suggested that plaintiff cut back on opioids to reduce her sleepiness, she insisted that she would not be able to function without them. Plaintiff received a prescription for Adderall.   (PageID.904).

On June 7, 2012, plaintiff began seeing Nidia Miedema, M.D.   Dr. Miedema noted that plaintiff reported pain intensity "out of proportion to the patient's general appearance."   Plaintiff displayed poor effort towards the examination.   She used guarded movements and was tearful.   (PageID.891).   A month later, Dr. Miedema was encouraging plaintiff to taper off methadone to a point where she could stop

taking it.   Eliminating the narcotic medication would help with her drowsiness. (PageID.889).

On July 23, 2012, plaintiff appeared at Mercy Health Partners and reported that about four days earlier, she fell down some steps and hit her left arm on the railing.   She was diagnosed with an acute left ulna fracture.   Her arm was placed in a splint and a sling and it healed without complication.   (PageID.938-40, 943).

On July 24, 2012, Ms. Tonya Robonson completed a mental RFC questionnaire and signed it.   She also obtained Dr. Miedema's signature.   (Page ID.930-34).

Plaintiff saw Dr. Miedema during a period from September 2012 through December 2012.   (PageID.955, 957-58, 960-62, 965-66).   The ALJ noted that the progress notes and laboratory reports from this period documented plaintiff's abuse of prescription medications:   "Records from Dr. Miedema in September 2012 showed unprescribed medications in urine samples in the past (Exhibit B25F p.17) [PageID.965].   Laboratory report on November 12, 2012 was positive for Methadone, with Methadone level being about 3 ½ times normal (Exhibit B25F pp. 11, 26) [PageID.959, 974].   Laboratory report on December 10, 2012 was positive for Oxycodone, with Oxycodone levels being 35 times the normal (p.20) [PageID.968]. The claimant is clearly taking excessive Methadone and Percocet, as noted in the records from Hackley Community Care Center on December 28, 2012 (p.5) [PageID.953 ], which is consistent with the laboratory reports."   (PageID.64).

On December 13, 2012, x-rays of plaintiff's lumbar spine returned normal results.   (PageID.936).   On December 28, 2012, plaintiff reported that she felt more alert when she took less methadone.   (PageID.953).

On January 2, 2013, plaintiff reported to Dr. Roessler that her SLE was under fair control under the regimen of prednisone and mycophenolate. Plaintiff continued to maintain normal muscle tone, bulk, and strength in both upper and lower extremities.   Her joint examination showed "no evidence of palpable synovitis, joint effusion or deformity." (PageID.985).   Dr. Roessler found that plaintiff's condition had clearly improved with this treatment.   Dr. Roessler noted that plaintiff continued to have an active pain syndrome.   She was angry that she still had pain. Dr. Roessler wrote:   "I told her that I cannot prescribe her opioid medications and I do not believe that the use of opioid medications is an optimal approach to the management of her chronic pain syndrome."   (*Id.*).

On February 26, 2013, plaintiff had her administrative hearing.   The exchanges that occurred when the ALJ questioned plaintiff about the progress notes from her most recent visit to her treating rheumatologist, Dr. Roessler, are set forth verbatim below:

Q      Well the doctor said you were kind of upset about the fact that they wouldn't prescribe narcotic pain meds for you and they tried to explain to you why they didn't think that, that was appropriate for this condition, is that right?

A      No.   When I first start off with my pain level they was trying to prescribe narcotics or any other pills.   So justly, I've been through so

- 19 -

many different kind of pills through all these histories.   Like, it don't make no sense.

                        . . .

Q      You know it looks like the U of M wanted you to get some lab studies done when you were down there but they said you left without having them done.   Was there – was that intentional?

A      No. I wasn't even told and I had someone in the room with me.   The doctor told me that he was ready for me to check out.   So as far as my blood work that I wasn't even told anything about having any of it done.

Q      In that same note, the doctor said that he wasn't going to order you any opioid medications for treatment of your pain, do you remember that?

A      No, he sent some medication right to Walgreen's and said that it was Prednisone and the Microsylilte [phonetic] that I picked up when I made it home.

Q      Well yeah but that's not – those are not opioid meds.   In fact he told you that he didn't think that was a good way to treat your problem, at least his notes says that.

A      What is that?

Q      Did you know that?

A      I don't even know what meds because I never went back in his office and ask for no meds.   I asked him to –

Q      Well let me read – let me – let me read what he says in his note and you tell me whether you remember any of this okay?

A      Okay.

Q      Says, "The patient was angry today that she still has pain.   I told her I cannot prescribe her opioid medications and I do not believe that the use of opioid medications is an optimal approach to the management of her chronic pain syndrome."   Do you remember him saying that to you on January 3rd, 2013?

A       No, I remember stating that due to all these medications they have on
        me and I still feel like I'm tired and hurting all these medications
        [INAUDIBLE] with every day on a regular basis is not helping me and
        I want to know what's going on.   Because I asked my other doctor like
        what is going on, is it another x-ray or MAG or nerve problem or nerve
        test you can run on me to make sure that everything that you all is doing
        for me is right.    And she told me when  I get to the U of – the
        University of Michigan says he do more of the Lupus for the pain – have
        him or ask him questions.   I never asked for any more pain medication
        at all.   As much as medication I take right now I don't think any other
        medication would even help this.

(PageID.87, 94-96).   Plaintiff acknowledged that Dr. Roessler was a specialist and

that Dr. Holman, her family doctor, was not.   She had traveled all the way to Ann

Arbor to obtain Dr. Roessler's opinion as a specialist.   (PageID.97-98).

      It was against this backdrop that the ALJ determined that Dr. Holman's letter

and RFC questionnaire responses were not entitled to weight because they were

opinions on issues reserved to the Commissioner, were conclusory, and were not well

supported by the objective evidence and the other evidence in this administrative

record.   (*See* Op. at 14, PageID.66).   Dr. Holman's November 2011 letter was not

entitled to any weight because the issue of disability is reserved to the Commissioner.

*See* 20 C.F.R. §§ 404.1527(d)(1), (3), 416.927(d)(1), (3); *Bass v. McMahon*, 499 F.3d at

511.   Similarly, RFC is an issue reserved to the Commissioner.   See 20 C.F.R. §§

404.1527(d)(2), (3), 416.927(d)(2), (3).   Dr. Holman's questionnaire responses

received appropriate consideration.   Here, plaintiff's treating specialist declined to

endorse use of opioid medication for the pain that plaintiff experienced stemming

from SLE and chronic pain, and record evidence showed that plaintiff was abusing

opioid medication which causes drowsiness.   The ALJ was not bound to accept Dr.
Holman's medically unsupported conclusions[7] regarding plaintiff's level of fatigue
and drowsiness.   The Court finds no violation of the treating physician rule.

**2.**

Plaintiff argues that the ALJ "cherry picked" the evidence and gave too little
weight to the opinions of two consultative examiners:   Psychologist Allison Bush and
Ms. Carolyn Boersma, a therapist.   (Plf. Brief at 14-16, PageID.1010-12; Reply Brief
at 3-4, PageID.1040-41).   Arguments that the ALJ mischaracterized or "cherry
picked" the administrative record are frequently made and seldom successful,
because "the same process can be described more neutrally as weighing the evidence."
*White v. Commissioner*, 572 F.3d 272, 284 (6th Cir. 2009). The narrow scope of judicial
review of the Commissioner's final administrative decision does not include re-
weighing evidence.   *See Ulman v. Commissioner*, 693 F.3d 709, 713 (6th Cir. 2012);
*Bass v. Mahon*, 499 F.3d 506, 509 (6th Cir. 2007); *see also Reynolds v. Commissioner*,
424 F. App'x 411, 414 (6th Cir. 2011) ("This court reviews the entire administrative

---

[7] ALJs are not bound by conclusory statements of doctors, particularly where they
appear on "check-box forms" and are unsupported by explanations citing detailed
objective criteria and documentation.   *See Buxton v. Halter*, 246 F.3d 762, 773 (6th
Cir. 2001); *see also Hernandez v. Commissioner*, No. 1:14-cv-958, 2015 WL 3513863,
at * 5 (W.D. Mich. June 4, 2015).   "Form reports in which a doctor's obligation is
only to check a box, without explanations of the doctor's medical conclusions are
weak evidence at best."   *Smith v. Commissioner*, No. 13-cv-12759, 2015 WL
899207, at * 14 (E.D. Mich. Mar. 3, 2015); *see also Ashley v. Commissioner*, No. 1:12-
cv-1287, 2014 WL 1052357, at * 8 n. 6 (W.D. Mich. Mar. 19, 2014)   ("Courts have
increasingly questioned the evidentiary value of 'multiple choice' or 'check-off'
opinion forms by treating physicians[.]").

record, but does not reconsider facts, re-weigh the evidence, resolve conflicts in evidence, decide questions of credibility, or substitute its judgment for that of the ALJ.").

Plaintiff is the one focusing on fragments of the record in isolation rather than in context.  Psychologist Bush and Ms. Boersma were consultative examiners, not treating sources.  Because they were not treating sources, the ALJ was not "under any special obligation to defer to [their] opinion[s] or to explain why he elected not to defer to [them]."  *Karger v. Commissioner*, 414 F. App'x 739, 744 (6th Cir. 2011); *see Peterson v. Commissioner*, 552 F. App'x 533, 539-40 (6th Cir. 2014).   The opinions of a consultative examiner are not entitled to any particular weight.  *See Peterson v. Commissioner*, 552 F. App'x at 539; *Norris v. Commissioner*, 461 F. App'x 433, 439 (6th Cir. 2012).

Plaintiff argues that the ALJ should have given greater weight to a sentence in Psychologist Bush's report where she expressed a concern that returning to work might cause plaintiff to decompensate:   "this examiner believes that a return to a structured repetitive concrete work environment may lead her into further decompensation with her depression."   (Plf. Brief at 15, PageID.1011) (citing Tr.630, found at PageID.662).   It is undisputed that "Ms. Bush never indicated Plaintiff had an actual episode of decompensation."   (Reply Brief at 4, PageID.1041).   There is no evidence in the record that plaintiff experienced any episode of decompensation.

The ALJ noted that plaintiff "ha[d] not received any ongoing counseling and ha[d] not required any psychiatric hospitalizations.   (Op. at 6, PageID.58). Further, the ALJ knew that plaintiff had "worked after the alleged disability onset date and had posted self-employment earnings in 2010 of $8,306.00" (PageID.102-03, 322-23, 340, 345, 349-50), yet plaintiff told Psychologist Bush (PageID.660) and others (PageID.651) that she "stopped her home hair stylist work right after her motor vehicle accident in November 2009."   (Op. at 4, PageID.56).

The sentence from Bush's report that plaintiff emphasizes was conjecture based on inaccurate information, not a medical opinion entitled to weight.   *See Kolar v. Commissioner*, No. 1:14-cv-503, 2015 WL 5589265, at * 6 (W.D. Mich. Sept. 22, 2015).   The ALJ considered Psychologist Bush's report and the opinions therein. His discussion of the results of Bush's consultative examination spans almost a full page of single-spaced text.   (Op. at 11-12, PageID.63-64).   The ALJ found persuasive Bush's opinion that plaintiff was capable of understanding retaining, and following simple instructions and gave it significant weight.   (*Id.* at 14, PageID.66). The Court finds no error.

Ms. Boersma is a therapist.   She conducted her consultative examination on March 16, 2010.   She did not have any treating relationship with plaintiff (PageID.528), and even if she did, her opinion would remain that of an "other source," rather than an acceptable medical source.   There is no "treating therapist" rule; accordingly, the opinion of a therapist is not entitled to any particular weight.   *See*

- 24 -

*Engebrecht v. Commissioner*, 572 F. App'x 392, 397-98 (6th Cir. 2014); *Hill v. Commissioner*, No. 1:12-cv-235, 2013 WL 2896889, at * 2-3 (W.D. Mich. June 13, 2013).   Therapists are not acceptable medical sources.   *See* 20 C.F.R. §§ 404.1513(a), (d)(1), 416.913(a).   Only "acceptable medical sources" can:  (1) provide evidence establishing the existence of a medically determinable impairment; (2) provide a medical opinion; and (3) be considered a treating source whose medical opinion could be entitled to controlling weight under the treating physician rule.   *See Titles II and XVI: Considering Opinions and Other Evidence from Sources Who are not 'Acceptable Medical Sources' in Disability Claims; Considering Decisions on Disability by Other Governmental and Nongovernmental Agencies*, SSR 06-3p (reprinted at 2006 WL 2329939, at * 2 (SSA Aug. 9, 2006)).   The opinions of therapists fall within the category of information provided by "other sources."   *See* 20 C.F.R. § 404.1513(d)(1), 416.913(d)(1).

The social security regulations require that information from other sources be "considered."   2006 WL 2329939, at * 1, 4 (citing 20 C.F.R. §§ 404.1513, 416.913); *Cole v. Astrue*, 661 F.3d 931, 939 (6th Cir. 2011); *Cruse v. Commissioner*, 502 F.3d 532, 541 (6th Cir. 2007); *See Hill v. Commissioner*, 2013 WL 2896889, at * 2-3.   This is not a demanding standard.   It was easily met here.   (Op. at 9, Page ID 57).   The ALJ considered Ms. Boersma's opinions stemming from the consultative examination that she conducted in March 2010, a few months after plaintiff's car accident.   (Op.

at 8-9, PageID.60-61). The ALJ gave more than adequate consideration to Ms. Boersma's opinions.

Plaintiff is correct that the ALJ's opinion did not include a second discussion of Ms. Boersma's report in his discussion of opinion evidence.   (Plf. Brief at 16, PageID.1012).   However, this oversight was inconsequential.   The Court reviews the ALJ's opinion as a whole, and the regulations distinguish between what an ALJ must consider and what he or she must explain.   *See Hill v. Commissioner*, 560 F. App'x 547, 551 (6th Cir. 2014); *Rice v. Barnhart*, 384 F.3d 363, 370 n.5 (7th Cir. 2004); *Roberts v. Commissioner*, No. 1:14-cv-355, 2015 WL 3936177, at * 4 (W.D. Mich. June 26, 2015).

Here, Ms. Boersma did not discuss plaintiff's normal objective test results. She did not identify any medical basis for imposing functional restrictions.   Her opinions were not entitled to any particular weight.   Plaintiff's treating rheumatologist and orthopedic specialists did not find a medical basis for imposing any such restrictions.   Thus, if any error occurred in the ALJ's consideration of Ms. Boersma's opinion, it was harmless.[8]   "No principle of administrative law or common sense requires [this Court] to remand a case in quest of a perfect opinion unless there is reason to believe that remand might lead to a different result."   *Kornecky v.*

---

[8] In *Shinseki v. Sanders*, 556 U.S. 396, 407 (2009), the Supreme Court observed that the harmless error standard is intended to "prevent appellate courts from becoming impregnable citadels of technicality."

- 26 -

*Commissioner*, 167 F. App'x 496, 507 (6th Cir. 2006) (quoting *Fisher v. Bowen*, 869 F.2d 1055, 1057 (7th Cir. 1989)).

3.

Plaintiff argues that the ALJ's decision should be overturned because his factual findings regarding her credibility and RFC for a limited range of sedentary work are not supported by substantial evidence.   (Plf. Brief at 16-20, PageID.1012-17; Reply Brief at 4-5, PageID.1041-42).   Plaintiff's burden on appeal is much higher than identifying pieces of evidence on which the ALJ could have made factual findings in her favor.   The Commissioner's decision cannot be overturned if substantial evidence, or even a preponderance of the evidence supports the claimant's position, so long as substantial evidence also supports the conclusion reached by the ALJ. *Jones v. Commissioner*, 336 F.3d at 477. RFC is an administrative issue reserved to the Commissioner.   20 C.F.R. §§ 404.1527(d)(2), (3), 416.927(d)(2), (3).   RFC is the most, not the least, a claimant can do despite her impairments.   20 C.F.R. §§ 404.1545(a)(1), 416.945(a)(1); *see Branon v. Commissioner*, 539 F. App'x 675, 677 n.3 (6th Cir. 2013); *Griffeth v. Commissioner*, 217 F. App'x 425, 429 (6th Cir. 2007).

Credibility determinations concerning a claimant's subjective complaints are peculiarly within the province of the ALJ.   *See Gooch v. Secretary of Health & Human Servs.*, 833 F.2d 589, 592 (6th Cir. 1987).   The Court does not make its own credibility determinations.   *See Walters v. Commissioner*, 127 F.3d 525, 528 (6th Cir. 1997).   The Court's "review of a decision of the Commissioner of Social Security,

- 27 -

made through an administrative law judge, is extremely circumscribed...." *Kuhn v. Commissioner*, 124 F. App'x 943, 945 (6th Cir. 2005). The Commissioner's determination regarding the credibility of a claimant's subjective complaints is reviewed under the "substantial evidence" standard. This is a "highly deferential standard of review." *Ulman v. Commissioner*, 693 F.3d 709, 714 (6th Cir. 2012). "Claimants challenging the ALJ's credibility determination face an uphill battle." *Daniels v. Commissioner*, 152 F. App'x 485, 488 (6th Cir. 2005). Indeed, the United States Court of Appeals for the Sixth Circuit has stated that an administrative law judge's credibility findings are "virtually 'unchallengeable.' " *Ritchie v. Commissioner*, 540 F. App'x 508, 511-12 (6th Cir. 2013) (quoting *Payne v. Commissioner*, 402 F. App'x 109, 112-13 (6th Cir. 2010)). "Upon review, [the Court must] accord to the ALJ's determinations of credibility great weight and deference particularly since the ALJ has the opportunity, which [the Court] d[oes] not, of observing a witness's demeanor while testifying." *Jones*, 336 F.3d at 476. "The ALJ's findings as to a claimant's credibility are entitled to deference, because of the ALJ's unique opportunity to observe the claimant and judge her subjective complaints." *Buxton v. Halter*, 246 F.3d at 773; *accord White v. Commissioner*, 572 F.3d 272, 287 (6th Cir. 2009); *Casey v. Secretary of Health & Human Servs.*, 987 F.2d 1230, 1234 (6th Cir. 1993).

Substantial evidence is defined as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402

U.S. at 401.   The ALJ's factual findings regarding plaintiff's credibility and RFC are supported by more than substantial evidence.


## **Conclusion**

For the reasons set forth herein, the decision of the Commissioner will be affirmed.


Dated:  March 14, 2016                              /s/ Janet T. Neff
                                              Janet T. Neff
                                              United States District Judge